UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JIAYAN SHOU, an individual, XIAOXIANG CHEN, an individual, YANYAN SONG, an individual, and YUAN CHAI, an individual, Plaintiff, v. JOE ZHENGHONG ZHOU, an individual, RAYMOND KU, an individual, NYC METRO REGIONAL CENTER, LLC, a New York limited liability company, and NYC FUND, L.P., a New York limited partnership, Defendants. | § § § § § § § § § § § § | **No.: 18-cv-5144** **JURY TRIAL DEMANDED** |

## COMPLAINT SEEKING DAMAGES AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs, Jiayan Shou, Xiaoxiang Chen,Yanyan Song and Yuan Chai file this Original Complaint seeking primary and permanent injunctive relief and damages against Defendants, Joe Zhenghong Zhou ("Mr. Zhou"), Raymond Ku ("Ku"), NYC Metro Regional Center, LLC ("NYC Metro") and NYC Fund, L.P.  ("NYC Fund" or the "Issuer") and allege as follows:

### INTRODUCTION

1.    Plaintiffs are victims of a multi-million-dollar fraud, conspiracy, and scheme to misappropriate and convert Plaintiffs' monetary investments by two individuals, primarily based in Queens County, New York, who are preying on foreign nationals desirous of leaving China to provide their families with the opportunity for a better life in the United States through the EB-5 program.

2.    Defendants conspired to fraudulently induce Plaintiffs to each invest $500,000, plus a $40,000-$60,000 "administrative fee," into a purported hotel real estate project in Long Island

City, known as the Long Island Twin Hotels Project including "a 224-room Crowne Plaza Hotel and an 88-room Hotel Indigo" ("Royal One Hotel Project") which, in reality, is nothing more than a façade under which Defendants are misusing, squandering and attempting to convert Plaintiffs' investment funds to benefit themselves.

3.     While Defendants marketed the Royal One Hotel Project to Chinese investors including the Plaintiffs as a way they could obtain EB-5 visas in exchange for investing $500,000 each in a potentially lucrative real estate venture in the United States, in reality these investments are currently in peril due to Defendants' misrepresentations, material omissions, repeated and continuous breach of fiduciary duties, and undisclosed conflicts of interest.

4.     The representations made to induce Plaintiffs' investments into the Royal One Hotel Project were false and misleading, calculated to induce investments by needy, trusting, unsuspecting foreigners with $500,000 seeking to send their children to the United States for an education and the opportunity to pursue a life with more opportunities than those afforded to them in China.  The representations made are mostly contained in the Private Placement Memorandum ("PPM").[1]

5.     The Royal One Hotel Project was doomed from the start and was created for Defendants' sole self-interest and benefit.  Defendants, primarily through the PPM misrepresented to Plaintiffs the funding for the Project, that the Project had already been under way in late 2013, and that the Project was on track to be completed even without the availability of EB-5 financing.

6.     These misrepresentations were made in the PPM as well as Chinese-language online and printed advertisements targeting Chinese individuals, many of whom can barely speak English.

7.     The Project's only prospect for possible success, as highly unlikely as it was given the willful misrepresentations in the PPM, was the Project's reliance on Royal Hotels & Resorts as

---

[1] Ex. A.

the Project's real estate developer.

8.      Royal Hotels and Resorts was comprised of the father/son development team of Jacob and Ruben Elberg, both of whom had many years of experience in developing real estate projects in New York City. These experienced developers were extremely vital to the success of this major real estate project, as the Project's only chance for success hinged on the real estate developer's expertise including their ability to successfully navigate the unique regulatory and economic constraints of attempting such a large project in New York City.

9.      The death knell for the Project occurred when Jacob Elberg passed away on December 20, 2013.  This was followed by his daughter, Tamara Pewzner, initiating an action in Kings County Surrogates' Court on January 16, 2014 to remove Ruben Elberg from control of Royal Hotels & Resorts.

10.      Defendants willfully failed to disclose this highly material information to investors including the Plaintiffs.   Defendants knew that had they revealed this information and supplemented and/or amended the PPM as they are legally obligated to do, the investors including Plaintiffs would not have invested in the Project, demanded their investment funds back or requested that the investment funds be directed to a new and less risky project.

11.      Defendants' self-interest in the Project was sole reason this information was not communicated and disclosed to the investors and the PPM not updated.

12.      As such, Defendants willfully did not disclose to investors and did not update the PPM to advise investors and potential investors that Pewzner's action as well as the subsequent litigations, placed the Project in grave peril as now the Project was no longer headed by an experienced developer at the helm, not to mention the likelihood the Project would be stalled for years until these issues were resolved in the courts.

13.      Defendants also willfully did not disclose to investors and did not update the PPM to

advise investors and potential investors that Ms. Pewzner was successful in wresting control of Royal Hotels & Resorts away from her brother, which led to the Project being stalled until 2016, at which time she was bought out by an entity related to Defendants for approximately $36 million.

14.     Defendants willful and contumacious conduct to induce and defraud investors were continuous and pervasive, and the PPM provided by Defendants to investors contained a slew of misrepresentations and false statements designed to induce and entice investors to invest in the Project.

15.     The misrepresentations contained in the PPM are false and intentionally misleading intended to induce investment from foreign investors in China including Plaintiffs.

16.     Moreover, Defendants distributed the PPM through at least May of 2014 while willfully concealing and misrepresenting material facts, during which time dozens of overseas Chinese investors including the Plaintiffs made the decision to invest while relying on the representations set forth in the PPM.

17.     After no progress had been made on the Project for several years, certain limited partners of NYC Fund requested information regarding the finance, management and operations of NYC Fund, the disclosure of which is required under Section 99 of New York's Partnership Law.

18.     Despite promises by Defendants and their counsel to the contrary, NYC Fund refused to provide any books and records.

19.     After threatened litigation and facing the prospect of an investigation by the U.S. Securities and Exchange Commission (the "SEC"), Defendants finally revealed Project's true status including the previously willfully withheld information mentioned herein.

20.     As a result of Defendants finally revealing to investors including Plaintiffs some information of the Project's true status including some of the misrepresentations made in the

PPM, numerous investors approached Defendants and demanded a full refund or to redirect their investment funds to a new project of their choice.

21.     Fearing liability from multiple lawsuits such as the instant one, upon information and belief, Defendants in a clear admission of wrongdoing granted the aforementioned investors' demands and provided the investors a full refund or allowed the investor's to redirect the investment funds into a new project of the investors' choice.

22.     Plaintiffs here seek the same relief Defendants afforded the other defrauded investors and pray the Court will award the same along with the costs and necessary attorneys' fees incurred as a result of Plaintiffs having to initiate the instant action against Defendants.

## PARTIES

23.     Jiayan Shou, is a Chinese national residing in Frisco, TX.  Shou invested $500,000 in the EB-5 Project for which his funds have been designated by Defendants for use in the fraudulent and mismanaged Hotel Project, plus $60,000 in administrative fees.

24.     Xiaoxiang Chen, is a Chinese national residing in Shanghai China.   Chen invested $500,000 in the EB-5 Project for which his funds have been designated by Defendants for use in the fraudulent and mismanaged Hotel Project, plus $60,000 in administrative fees.

25.     Yanyan Song, is a Chinese national residing in State College PA.   Song invested $500,000 in the EB-5 Project for which her funds have been designated by Defendants for use in the fraudulent and mismanaged Hotel Project, plus $60,000 in administrative fees.

26.     Yuan Chai, is a Chinese national residing in Kearny NJ.  Song invested $500,000 in the EB-5 Project for which his funds have been designated by Defendants for use in the fraudulent and mismanaged Hotel Project, plus $60,000 in administrative fees.

27.     Joe Zhenghong Zhou is the CEO of NYC Metro and NYC Fund and is also an attorney

admitted to practice in the State of New York.  Mr. Zhou's law firm, the Law Office of Joe Zhenghong Zhou & Associates, PLLC is located at Queens Crossing Business Center, 136-20 38th Ave., Suite 10H, Flushing, NY 11354.[2]

28.     Raymond Ku is the CFO of NYC Metro and was to be compensated out of NYC Metro's compensation.  Upon information and belief, Ku resides in Taipei, Taiwan.  Ku is the founder and principal of Westlead Group ("Westlead").

29.     NYC Metro is a limited liability company created under the laws of New York.  NYC Metro serves as the General Partner of NYC Fund, L.P. for the offering and raised the funds for the Hotel Project from investors including Plaintiffs.  NYC Metro's principal place of business is the same as Mr. Zhou's: Queens Crossing Business Center, 136-20 38th Ave., Suite 10H, Flushing, NY 11354.

30.     NYC Fund, L.P. is a domestic limited partnership created under the laws of New York. NYC Fund serves as the Limited Partner of NYC Metro.  NYC Fund's principal place of business is the same as Mr. Zhou and NYC Metro's: Queens Crossing Business Center, 136-20 38th Ave., Suite 10H, Flushing, NY 11354.

## JURISDICTION AND VENUE

31.     This action involves, among other things, common law fraud and securities fraud, conspiracy, and breach of fiduciary duty that was perpetrated on Plaintiffs to obtain each of their investments and "administrative fees" of $500,000 and $40,000-$60,000, respectively.

32.     Plaintiffs are foreign Chinese nationals that were fraudulently induced to each invest $500,000, plus $40,000-$60,000 in administrative fees, based on the representations made by Defendants.

33.     Claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15

---

[2] https://www.joezhoulawfirm.com/

U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

34.     The Court also has jurisdiction under supplemental state law jurisdiction.

35.     In connection with the conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails and interstate communications.

36.     Venue is proper in this forum under 28 U.S.C. § 1391, 15 U.S.C. §78aa, and because a substantial part of the acts, transactions, and events giving rise to the claims occurred in Queens County, New York. Additionally, Defendants are residents of Queens County, New York, and transact business in Queens County, New York.

37.     All conditions precedent to this action have been performed, have occurred or have been waived.

38.     Plaintiffs have retained the undersigned counsel to represent them in this action and have agreed and obligated to pay a reasonable fee for their services.

## GENERAL ALLEGATIONS

### EB-5 Visa Program in General

39.     The Immigrant Investor Program, more commonly known as the EB-5 program, was created by the Immigration Act of 1990. Congress established the EB-5 program to stimulate the U.S. economy by giving immigrant investors the opportunity to permanently live and work in the United States after they have invested in a new commercial enterprise ("NCE"). In the case of an NCE that is located in a Targeted Employment Area ("TEA"), *i.e.,* either a rural area or an area beset by high unemployment, the required equity investment need only be $500,000.

40.     In 1993, Congress created the Immigrant Investor Pilot Program to increase interest in

the EB-5 visa program. This new pilot program established EB-5 Regional Centers ("Regional Centers"), which are entities that receive special designation from the United States Citizenship and Immigration Services ("USCIS") to administer EB-5 investments and create jobs. Public and private entities may apply to the USCIS for approval as an EB-5 Regional Center.

41.     EB-5 visa programs administered by a Regional Center provide more flexibility, because the immigrant investor who invests in such a program is permitted to take credit not only for direct jobs created in the NCE but also "indirect jobs" created outside the NCE in a job creating enterprise ("JCE"), such as a construction contracting firm that builds an improvement for the NCE. In addition, the immigrant investor need not handle the day-to-day management of the NCE or even necessarily live in the region where the NCE is located.

42.     By necessity, investments into an EB-5 program are "closed-ended," available only to a specified number of investors, and that number is tied to the number of direct or indirect jobs created by the investment. If too few jobs are created with the money invested, the immigrant will not be able to become a permanent resident in the United States.

**EB-5 Practice and Procedure**

43.     Under the EB-5 program, the immigrant investor first applies for an immigrant visa by submitting a Form I-526, Immigrant Petition for Alien Entrepreneur. USCIS' approval  of the Form I-526 is conditioned upon the immigrant's investment of the requisite amount of money in an NCE that satisfies the applicable legal requirements. Upon approval of the Form I- 526 petition, the immigrant investor may either: (1) file the appropriate form to adjust their status to a conditional permanent resident within the United States; or (2) file an application to obtain an EB-5 visa for admission to the United States. Upon the approval of the application or upon entry into the United States with an EB-5 immigrant visa, the EB-5 investor and derivative family members will be granted conditional permanent residence for a two-year period.

44.     To remove the conditional resident status, the immigrant investor must file a Form I-829, Petition by Entrepreneur to Remove Conditions, ninety days before the two-year anniversary of the granting of the EB-5 investor's conditional resident status. USCIS' approval of the Form I-829 is conditioned upon proof that the immigrant investor's investment has created at least ten full-time jobs in the NCE or JCE. If an insufficient number of jobs was created, the foreign national is subject to removal from the United States.

**EB-5 Program and the Royal One Hotel Project**

45.     As set forth in the PPM governing the transaction, the plan for the Royal One Hotel Project was for NYC Fund to raise up to $44.5 million by selling limited partnership interests to Chinese investors, which it would then loan to Royal One Real Estate LLC ("Royal One"), in connection with the general partner, NYC Metro.[3]  Royal One would then contribute these funds to Royal CP Holdings, LP ("Royal CP") and Royal HI Hotel Holdings, LP ("Royal HI"), the owners of the properties on which the hotels were to be built, who would then pledge various security interests to secure Royal One's loan.

46.     These funds were to be buttressed via additional bridge loans totaling $38 million from International Bank of Chicago ("IBC") to finance the actual costs of construction of the hotels, which was also secured by mortgages on the property. The loans were to be repaid out of the funds raised by NYC Fund's sale of limited partnership interests, and would not be repaid until the investors' EB-5 visa applications had been approved.[4]

**Nefarious Lies**

**A.  PPM Misrepresentations**

47.     The PPM's misrepresentations are plentiful and clearly demonstrate Defendants' intent to defraud investors including Plaintiffs.

---

[3] NYC Metro was the holder of the relevant regional rights for the project.  *See* Ex. A., p. 10.

48.     To begin with, the PPM materially misstated the fees and commissions received by NYC Metro. As stated on pages 17 and 18 of the PPM, NYC Metro, as general partner, was to receive the following additional compensation in connection with the Offering: (i) a one time fee of one percent (1%) of the full amount of the Loan made by the Partnership for the Project, with 0.25% to be paid when each EB-5 investment has been deposited into the Offering escrow account and 0.75% to be paid at the time of funding of the Loan; and (ii) an annual fee of up to one percent (1%) per annum on the amount of the Loan, subject to reduction based on the source of Investors as determined upon the termination of the Offering.[5] In addition, the PPM stated that any commissions or fees paid to immigration consultants, brokers, investment advisors, agents or others, would be paid out of these fees and, if necessary distributions paid to NYC Metro, not the $44.5 million paid by the EB-5 Investors.

49.     However, the true commission arrangement was that NYC Metro would receive a continuing fee of *four percent (4%) per annum* including the 1% to be shared with EB-5 investors by NYC Fund on the outstanding principal amount of the loan contributed by Existing EB-5 Investors and by other investors recruited by NYC Metro under this Agreement up to a maximum of 20 total EB-5 Investors, and a continuing fee of one percent (1%) per annum on the outstanding principal amount of the Loan contributed by all other EB-5 Investors, until such time as the Loan is repaid in full. [6]

50.     The PPM also contained key misrepresentations about the square footage of the two properties, thereby overstating the ability of the EB-5 Investors to recover any profit from their investments.

51.     Specifically, the PPM stated that the square footage of the two properties was 20,900

---

[4] *See* Ex. A, p. 9.
[5] *See id.*
[6] *See* Ex. B.

square feet.[7]  However, reports from an independent registered architect indicated that the total area of the two properties is only 18,323 square feet, a variance of more than 10%.[8]

### B.  Misleading and Fraudulent Marketing Materials

52.    In the Project's Marketing Materials, NYC Fund misrepresented that David Paterson, the Former Governor of the State of New York, had accepted the position of Chief Advisor of its Advisory Board due to his trust and support of the project.[9] The Marketing Materials "cited" comments allegedly made by David Paterson on the project, "---currently the best and flawless EB-5 project in New York."

53.    The Marketing Materials also indicated that Paterson had helped to successfully secure $40 million in government funds from New York City that would be spent on the green belt and landscape construction nearby the project sites.[10]

54.    These representations were of vital importance to and justifiably relied upon by the EB-5 investors including Plaintiffs as Mr. Paterson's involvement not only lent an air of legitimacy to the Project, but his successful procurement of government funds also reassured investors about the chances of successfully completing this Project in a difficult regulatory environment.

55.    However, these representations were never verified by the GP and are believed to be false.

56.    The marketing materials prepared by NYC Fund, NYC Metro, Zhou, Ku, Westlead Capital Inc. and their agents in China ("the Marketing Materials") [11] further misrepresented that the project secured approximately $32 million in non-EB-5 funds, as well as a $38 million bridge loan from the International Bank of Chicago, and that the hotel project had been started in

---

[7] *See* Ex. A, p. 15.
[8] *See* Assessment Letters, Exs. C & D, at p. 3 (indicating that one property had an area of 13,909 sq. ft. and the other 4,414 sq. ft.).
[9] *See* Ex. E, p. 5.
[10] *See* the translation of the Marketing Materials in Ex. E.
[11] *See* Ex. E.

late 2013 and would proceed and be completed *even without* the availability of the EB-5 financing.

57.     These misrepresentations were made in Chinese-language advertisements targeting Chinese individuals, many of whom can barely speak English.

58.     The Marketing Materials prepared by Ku and Westlead also falsely stated that "The project [developer] and IHG *have executed* [Franchise] Agreement."[12]  However, this is false, as the PPM itself concedes, the parties simply intend to reach an agreement with IHG to brand and market the hotels.[13]

59.     Defendants knew full well that had the EB-5 Investors including Plaintiffs been aware that no agreement had been reached with IHG, the investors would have been extremely reluctant to invest in the Project.

### C.  Purposeful Omissions of Material Facts

60.     As mentioned above, Defendants withheld material facts pertaining to the real estate investors ("the Elbergs"), whose expertise the investors including the Plaintiffs relied upon. Moreover, the Elbergs' participation in the Project was a substantial factor in Plaintiffs' decision to invest in the Project.

61.     As such, the elder Elberg's passing and Pewzner's legal actions removing Ruben Elberg from control of Royal Hotels & Resorts should have been timely disclosed to Plaintiffs, and Defendants purposely did not supplement and/or amend the PPM in order to conceal this information.

62.     Defendants also purposely omitted key details in the PPM about the compensation to be received by Ku and Westlead, the company that had worked to facilitate investor immigration programs in China and other Asian countries since 1988.  Notably, Ku is the founder and

---

[12] *See id.*
[13] *See* Ex. A, pg. 9.

principal of Westlead.  Moreover, Ku acted as the Chief Financial Advisor of NYC Metro and according to the PPM, Ku was to be compensated out of the General Partner's compensation.[14]

63.      As blatant as this conflict of interest is, the PPM and the other offering documents are silent about the fact that Westlead would receive an "Initial Wholesale Fee" for each EB-5 investor introduced by Westlead, equal to *5%* of the amount invested by such EB-5 investor. Additionally, it was not revealed that Westlead would be entitled to "Annual Wholesale Fee" for each EB-5 investor introduced by Westlead, as follows:

> "Following [Royal CP's and Royal HI's] payment of the Initial Wholesale Fee to Westlead for each EB-5 Investor, Developer shall continue to pay an ***annual*** wholesale fee of ***five (5) percent*** of each EB-5 Investor's $500,000 ("Annual Wholesale Fee"), on a monthly basis starting fourteen (14) working days after the first anniversary of the release of each EB-5 Investor's $500,000 from escrow, and continuing thereafter until such EB-5 Investor's investment capital is repaid to such EB-5 Investor."

On information and belief, to be an eligible lawful permanent residency petitioner, an EB-5 investor's investment capital is normally sustained for five (5) years or even longer before it can be repaid. Therefore, the total amount of "Annual Wholesale Fee" that Westlead may receive would be as high as 25% of teach EB-5 Investor's $500,000, on top of the 5% in "Initial Wholesale Fee". Upon information and belief, Westlead "successfully" raised 44.5 million USD from 89 EB-5 Investors, rendering it entitled to approximately $13,000,000 in "Initial Wholesale Fee" and "Annual Wholesale Fee" ("commissions and fees"). The PPM or any marketing materials prepared by Westlead

---

[14] *See* Ex. A, p. 18.

or its agent in China, had no single word disclosing this material related transaction to EB-5 investors. Had investors known of that 30% of their investment capital would be paid in commissions and fees to Westlead controlled by Ku, the CFO of NYC Metro, they may have decided not to invest or at least conducted a due diligence investigation of the transaction.

64.     By the express terms of the Marketing Materials[15], this transaction was to be limited to 89 investors.  However, in an attempt to raise additional funds for themselves while diluting any potential recovery from investors, Royal CP Hotel LP and Royal HI Hotel LP, the two entities supposed to develop the two hotels, raised at least an additional $5,000,000 in capital contributions from at least 10 additional investors.  This information was not timely disclosed to the investors including Plaintiffs.

65.     This omission is highly material because the EB-5 program requires that 10 new full jobs be created by each EB-5 investor's investment, which is basically calculated as follows: the total number of new direct and indirect jobs created divided by the total number of EB-5 investors (the "Job Creation Rule").

66.     As such, the immigration benefits the investors including Plaintiffs were to receive as a result of their EB-5 investment was now in great peril as the existence of ten (10) additional EB-5 investors requires the creation of at least one hundred (100) new jobs by the same projects and the same amount of investment.

67.     Mr. Zhou, as an attorney specialized in immigration law, and Ku who "has over 20 years of experience in immigration business" EB-5 had full knowledge of the Job Creation Rule and failed to disclose this information as he knew full well many investors including Plaintiffs would pull out of the Project.  As such, Mr. Zhou has breached his ethical obligations as both a

---

[15] *See* Ex. E,  p. 5 ("Marketing Material I-Westlead").

fiduciary and as an attorney.

68.     Defendants also chose not to disclose to the investors including Plaintiffs that Ku and Westlead Capital were involved in other troubled EB-5 projects and that were sued multiple times for misappropriation of funds and violations of the Securities Act.

69.     The troubling nature of Defendants' conduct is further illustrated by their failure to make required disclosures.

70.     Notably, certain limited partners of NYC Fund requested information regarding the finance, management and operations of NYC Fund, the disclosure of which is required under Section 99 of New York's Partnership Law.

71.     Despite promises by their counsel to the contrary, NYC Fund failed to provide any such books and records.

72.     Interestingly, in response to the inquiries from EB-5 Investors on the work schedule of the Project, NYC Fund responded by sending a document entitled "Construction Processing 42-59 Crescent Street and 25-10 42nd Street", allegedly prepared by Greenpoint Construction Corporation, the general contractor, which has little experience in building high steel structure buildings.[16]

73.     As per a Work Schedule contained in the above document, the construction of one hotel project would be started in March-April 2017 and completed in 18 months; the other one, started in May-June 2017 and completed in 24 months.

74.     It is now August 2018 and upon information and belief, the construction of one hotel project barely started but was currently subject to multiple Full Stop Work Orders of the New York City Department of Buildings, and the other hotel project has not seen any substantial work.

---

[16] *See* Ex. E, Letter from NYC Fund re: Status Update on Long Island City NY Hotel EB-5 Project dated February 12, 2017.

**COUNT 1 – Injunctive Relief Against All Defendants Under NY CPLR § 6301**

75.    Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 73 in this Complaint as though fully set forth herein.

76.    Each Plaintiff provided $500,000 plus at least $60,000 for administrative fees to Defendants.

77.    Defendants conspired to fraudulently induce Plaintiffs to each invest $500,000, plus a $40,000-$60,000 "administrative fee," into a purported hotel real estate project in Long Island City, known as the "Royal One Hotel Project" which, in reality, is nothing more than a façade under which Defendants are misusing, squandering and attempting to convert Plaintiffs' investment funds to benefit themselves.

78.    As a result of Defendants' fraudulent conduct, Plaintiffs' EB-5 investments and Plaintiffs' EB-5 immigrant visas are in great peril, and immediate injunctive relief is necessary to protect Plaintiffs from irreparable harm.

79.    In the absence of immediate injunctive relief, Plaintiffs will suffer irreparable damage and harm and there is, and will continue to be, an immediate danger of significant loss and continued harm to Plaintiffs including the lost opportunity for the EB-5 immigrant visas.

80.    It is clearly in the public interest to enter immediate temporary injunctive relief and permanent injunctive relief restraining Defendants, and anyone else that has received Plaintiffs' investment funds from misusing or misappropriating Plaintiffs' investment funds. The entry of an injunction will serve to enforce and protect Plaintiffs' legal rights and will promote the public interest by restraining Defendants from misusing or misappropriating EB-5 investment funds, and by preventing Defendants from further benefiting from their unlawful and fraudulent conduct.

**COUNT 2 – Fraud in the Inducement Against Defendants**

81.     Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 73 in this Complaint as though fully set forth herein.

82.     As specifically described above, Defendants made knowingly false statements concerning material facts in the Offering Documents, Marketing Materials, and PPM.

83.     As specifically described above, Defendants also knowingly withheld material facts from investors including in the Offering Documents, Marketing Materials, and PPM.

84.     Upon information and belief, Mr. Zhou and Ku made knowingly false oral statements concerning material facts when they induced investors including Plaintiffs to invest in the Royal One Project.

85.     Defendants knew their representations were false, and intended for the Chinese investors including Plaintiffs to rely upon the representations and be induced by them to invest in the NYC Fund, and specifically the Royal One Project.

86.     Defendants knew their omissions were material, and intended for the Chinese investors including Plaintiffs to rely upon the information Defendants provided so as to induce said investors including Plaintiffs to invest in the NYC Fund, and specifically the Royal One Project.

87.     Plaintiffs justifiably relied upon Defendants' representations and have been damaged.

**COUNT 3 – Fraud Against All Defendants**

88.     Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 86 in this Complaint as though fully set forth herein

89.     As specifically described above, Defendants made knowingly false statements concerning material facts in the Offering Documents, Marketing Materials, and PPM.

90.     As specifically described above, Defendants also knowingly withheld material facts from investors including in the Offering Documents, Marketing Materials, and PPM.

91.     Upon information and belief, Mr. Zhou and Ku made knowingly false oral statements

concerning material facts when they induced investors including Plaintiffs to invest in the Royal One Project.

92.     Defendants knew that their representations were false, and intended for the Chinese investors including Plaintiffs to rely upon the representations and be induced by them to invest in the NYC Fund, and specifically the Royal One Project.

93.     Defendants knew their omissions were material, and intended for the Chinese investors including Plaintiffs to rely upon the information Defendants provided and to induce said investors including Plaintiffs to invest in the NYC Fund, and specifically the Royal One Project.

94.     Defendants' fraud is perpetual and continues and Plaintiffs have only recently discovered the full scope of Defendants' deception.

95.     Plaintiffs justifiably relied upon Defendants' representations and have been damaged.

**COUNT 4 - Aiding and Abetting Fraud Against Mr. Zhou and Ku**

96.     Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 94 in this Complaint as though fully set forth herein.

97.     As specifically described above, Defendants committed perpetual fraud against Plaintiffs.

98.     Mr. Zhou and Ku had knowledge that perpetual fraud had been committed upon Plaintiffs.

99.     Mr. Zhou and Ku knowingly aided and abetted the commission of said fraud against Plaintiffs.

100.    Mr. Zhou and Ku prepared, sanctioned and/or willfully failed to correct or amend/supplement the PPM and marketing materials that were provided to Plaintiffs to induce their investments.

101.    Mr. Zhou and Ku assisted in the inducement of the investments by orchestrating the appearance of an actual real estate project when, in reality, the project was simply a façade to

benefit themselves to the detriment of the EB-5 investors including Plaintiffs.

102.    Mr. Zhou substantially assisted Ku and Westlead to commit fraud as alleged herein and profited therefrom.

103.    Plaintiff were substantially damaged by the acts and/or omissions of Mr. Zhou and Ku.


**COUNT 5– Breach of Fiduciary Duty Against Mr. Zhou, Ku, and NYC Metro**

104.    Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 73 in this Complaint as though fully set forth herein.

105.    Mr. Zhou, Ku and NYC Metro owed Plaintiffs and the limited partners of NYC Fund a fiduciary duty and other implied duties arising from their service as general partners or persons purporting to act as general partners of NYC Fund and the Royal One Project, including the duties of loyalty and care.

106.    Moreover, Plaintiffs reposed their trust and confidence in Mr. Zhou, Ku and NYC Metro, which they accepted.  Plaintiffs were dependent on Mr. Zhou, Ku, and NYC Metro and their purported expertise in the United States EB-5 visa program, and said Defendants knowingly undertook and accepted the duty to advise, counsel, and protect Plaintiffs.

107.    Mr. Zhou, Ku, and NYC Metro's duty of loyalty included the duty to refrain from self-dealing and making misrepresentations or omissions of material facts pertaining to the Royal One Project, and to hold as trustee any property derived by the general partner in the conduct of the limited partnership's activities.

108.    Mr. Zhou, Ku and NYC Metro's duty of care included the duty to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

109.    Mr. Zhou, Ku, and NYC Metro's knowingly false statements and omissions concerning material facts about the Royal One Project as stated herein, including but not limited to false

statements of the fees and commissions received by NYC Metro from the LP and blatant omissions of conflict of interests, breached their fiduciary duties to Plaintiffs.

110.    Mr. Zhou, Ku, and NYC Metro's breach of their fiduciary duties have caused Plaintiffs substantial damage and greatly threaten Plaintiffs' EB-5 visas.


**COUNT 6 – Aiding and Abetting Breach of Fiduciary Duty Against Mr. Zhou and Ku**

111.    Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 73 and paragraphs 103 through 109 in this Complaint as though fully set forth herein.

112.    Mr. Zhou, Ku, and NYC Metro owed Plaintiffs fiduciary duties.

113.    Mr. Zhou, Ku and NYC Metro breached their fiduciary duties to Plaintiffs.

114.    Mr. Zhou had knowledge that Ku and NYC Metro breached their fiduciary duties to Plaintiffs as stated herein.

115.    Ku had knowledge that Mr. Zhou and NYC Metro breached their fiduciary duties to Plaintiffs as stated herein.

116.    Mr. Zhou and Ku knowingly aided and abetted the commission of the breach of fiduciary duty against Plaintiffs.

117.    Mr. Zhou substantially assisted or encouraged Ku and NYC Metro to breach their fiduciary duties.

118.    Ku substantially assisted or encouraged Mr. Zhou and NYC Metro to breach their fiduciary duties.

119.    Plaintiffs were damaged by the actions of Mr. Zhou and Ku as stated herein.

**COUNT 7 – Removal of NYC Metro as the General Partner of NYC Fund, L.P.**

120.    Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 73 and paragraphs 103 through 118 in this Complaint as though fully set forth herein.

121.    NYC Metro is a limited liability company created under the laws of New York.  NYC Metro serves as the General Partner of NYC Fund, L.P. for the offering and raised the funds for the Hotel Project from investors including Plaintiffs.

122.    NYC Fund, L.P. is a domestic limited partnership created under the laws of New York. NYC Fund serves as the Limited Partner of NYC Metro.

123.    Plaintiffs are limited partners of NYC Fund.

124.    As described above, given the numerous acts of fraudulent and self-dealing conduct committed by Defendants, it is clear that Defendants breached their fiduciary duty of loyalty to NYC Fund and Plaintiffs.

125.    Further, NYC Metro and Mr. Zhou have proven that they cannot be trusted, as they have defrauded and lulled investors including Plaintiffs for years with lies that all was well, even mischaracterizing, omitting and/or providing false statements in the PPM and Marketing Materials.

126.    Both NYC Metro and Mr. Zhou should be removed as the General Partner of NYC Fund and a new General Partner along with new independent decision makers should be appointed so that Plaintiffs' rights and interests are protected.

127.    Accordingly, this equitable relief is necessary to avoid irreparable harm to the Plaintiffs and serves the public interest.

**COUNT 8 – Violation of New York Deceptive and Unfair Trade Practices Act against Mr. Zhou, Ku and NYC Metro**

128.    Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 73 and paragraphs 87 through 94 in this Complaint as though fully set forth herein.

129.    Mr. Zhou, Ku and NYC Metro committed securities fraud, and as a result committed separate, independent, unfair and deceptive acts against Plaintiffs in New York.

130.    New York, General Business Law Section 349 prohibits and provides remedies for

"[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state."

131.    As set forth herein, said Defendants engaged in deceptive acts or practices by inducing Plaintiffs to invest in the Royal One EB-5 Project in New York State and willfully and perpetually failed to provide timely disclosure of material facts regarding the Royal One Project.

132.    Defendants' acts were consumer-oriented and targeted investors including Plaintiffs.

133.    Plaintiffs have and will suffer actual economic damages and loss of a business opportunity to obtain EB-5 visas as a direct result of the Defendants' deceptive and unfair trade practices.

134.    As such, Plaintiffs seek injunctive relief to enjoin Defendants from jeopardizing, wasting and/or converting their investment in the Royal One Project.

135.    Plaintiff should also be compensated for any damages sustained including attorneys' fees incurred as a result of the need to file the instant action.

**COUNT 9– Civil Conspiracy Against All Defendants**

136.    Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 134 in this Complaint as though fully set forth herein.

137.    Defendants are parties to a conspiracy.

138.    There was an agreement between Defendants to do an unlawful act or to do a lawful act by unlawful means, there were overt acts in furtherance of the conspiracy, and Plaintiffs were damaged as a result of acts done under the conspiracy.

139.    As described above, the basis of the conspiracy is a fraud and attempted conversion of Plaintiffs' investment money and administrative fees, which are independent torts that give rise to causes of action if committed by one person.

140.    Defendants entered into a conspiracy and acted in concert to market a fraudulent

investment scheme to Plaintiffs, convert their money, and then distribute and dissipate the money among themselves.

141.    Defendants acted with the full knowledge and awareness that the investment scheme was designed to fraudulently procure and steal Plaintiffs' funds under the guise of an EB-5 visa investment opportunity.

142.    Defendants acted contrary to law, acted according to a predetermined and commonly understood plan of action for the purpose of obtaining Plaintiffs' funds, and took overt acts in furtherance of the conspiracy.

143.    There was a meeting of minds between and among Defendants to commit the unlawful acts alleged herein.

144.    Plaintiffs have suffered damages as a result of the conspiracy.

**COUNT 10 – Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

145.    Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 73 and 87 through 94 in this Complaint as though fully set forth herein

146.    Defendants carried out a plan, scheme, and course of conduct that was intended to, and did (i) deceive Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase limited partnership interests in Royal One Project. In furtherance of this unlawful scheme, Defendants took the actions set forth hereinabove.

147.    Said Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon purchasers of NYC Fund limited partnership units for the Royal One Project in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

148.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a course of conduct to conceal adverse material information about the Project, the status of construction at the Project and conflicts of interests, among other things, as specified herein.

149.    These defendants each employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the value of investing in the Royal One Project, which included the making of, or the participation in the making of, untrue statements of material facts about the Royal One Project and omitting to state material facts necessary in order to make the statements made not misleading.

150.    Defendants primary liability arises from the following facts, among others: (i) they were high-level officers within NYC Metro, NYC Fund, Royal One Project and/or high-level players in the scheme to sell foreign investors limited partnership interests in NYC Fund and/or in the Royal One Project; (ii) they, by virtue of their responsibilities and activities as high-level players in the scheme, were privy to and participated in the creation, development and publication of Royal One Project's sales, marketing, projections and/or reports; and (iii) they were aware of Royal One Project's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

151.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set for herein, or acted with severely reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing information regarding Royal One Project's true status as a façade and vehicle for a massive fraud and conversion.

152.    As a result of the dissemination of materially false and misleading information and

failure to disclose material facts, as set forth herein, Royal One Project appeared to be a legitimate investment opportunity for foreigners seeking a path to United States residency via an EB-5 visa. In ignorance of the fact that Royal One Project securities were merely a façade for a fraudulent and criminal scheme, Plaintiffs invested their money into Royal One Project and were damaged thereby.

153.    At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity and believed them to be true. Had Plaintiffs known of Defendants' fraudulent practices, Plaintiffs would not have purchased or otherwise acquired their interests/securities in the Royal One Project.

154.    Moreover, Plaintiffs have only recently discovered the scope of Defendants' deception.

155.    By virtue of the foregoing, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

156.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases of limited partnership interests in Royal One Project.

**COUNT 11 – Violations of Section 20(a) of the Exchange Act Against All Defendants**

157.    Plaintiffs incorporate by reference each of the allegations set forth in paragraphs 1 through 73, paragraphs 87 through 94 and paragraphs 144 through 154 in this Complaint as though fully set forth herein.

158.    Defendants acted as controlling persons of NYC Metro, NYC Fund and the Royal One Project within the meaning of Section 20(a) of the Exchange Act as alleged herein.

159.    By virtue of their high-level positions within the Royal One Project, NYC Fund and NYC Metro and/or high-level positions within the scheme to sell foreign investors limited partnership interests in NYC Fund and in the Royal One Project, participation in and/or

awareness of Royal One Project, NYC Fund and NYC Metro operations, and/or intimate knowledge of Royal One Project, NYC Fund and NYC Metro fraudulent practices and Royal One Project's actual status and true prospects, Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of NYC Fund and the Royal One Project, including the content and dissemination of the various statements which Plaintiffs contend were false and misleading.

160.    Defendants were provided with, or had unlimited access to, copies of Royal One Project's reports, sales materials, brochures, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

161.    In addition, Defendants had direct involvement in the day-to-day operations of Royal One Project, NYC Metro, and NYC Fund and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

162.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions. By virtue of their controlling positions, they are liable under Section 20(a) of the Exchange Act.

163.    As a direct and proximate result Defendants' conduct, Plaintiffs suffered damages in connection with their purchases of interests in and/or securities of the Royal One Project.

## **DEMAND FOR JURY TRIAL**

164.    Plaintiffs demand a trial by jury on all triable issues.

## **PRAYER**

WHEREFORE, Plaintiffs demand judgment including the following against Defendants:

1.      For immediate injunctive relief prohibiting Defendants from using Plaintiffs' investment funds for the Royal One Project to prevent Defendants from further jeopardizing,

wasting and/or converting Plaintiffs' investment in the Royal One Project, and allowing Plaintiffs to reinvest their investment funds into an investment of their choosing.

2.      For injunctive relief to remove NYC Metro and Mr. Zhou as General Partner of NYC Fund.

3.      For monetary damages caused as a direct and proximate result of Defendants' misconduct and wrongful actions.

4.      For exemplary damages given Defendants' egregious, willful and wanton conduct.

5.      Any other specific relief alleged herein, including costs and attorney fees incurred in bringing this action;

6.      Pre- and post-judgment interest on all damages as allowed by law;

7.      Such other and further relief as this Court deems reasonable and just.

DATED this 11th day of September 2018.


Respectfully Submitted,

NGUYEN & CHEN, LLP

*/s/Brian M. Gargano*
BRIAN M. GARGANO
bgargano@nguyen-chen.com
JIANGANG OU
jou@nguyen-chen.com
THEODORE GEIGER
tgeiger@nguyen-chen.com
11200 Westheimer, Suite 120
Houston, Texas 77042
(832) 767-0339
(832) 767-0669 (Fax)

**ATTORNEYS FOR PLAINTIFF**